FILED

2009 May-14  PM 04:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **JOI BROWN and SHAUN SONIA,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Case No.: 5:07-CV-1013-VEH** |
| | ) |
| **CITY OF HUNTSVILLE,** | ) |
| **ALABAMA; GERALD L. NORRIS;** | ) |
| **and J. ANDERSON,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION

### I.    INTRODUCTION

This civil rights lawsuit was initiated on May 31, 2007.  (Doc. 1). Currently pending before the court are three Motions for Summary Judgment (Docs. 37-39) filed by each of the defendants in this case, Jimmy Anderson ("Investigator Anderson"), Gerald Norris ("Sergeant Norris"), and the City of Hunstville, Alabama (the "COH"), respectively, as to all claims of Plaintiffs Joi Brown ("Brown") and Shaun Sonia ("Sonia").

Plaintiffs' original complaint set forth claims for false arrest under the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 (count I) and for false

arrest/false imprisonment under state law (count II) against Defendants Norris, Anderson, and the COH. (Doc. 1). On April 22, 2008, Plaintiffs amended their complaint to include a claim for excessive force under the Fourth and Fourteenth Amendments pursuant to §1983 (count III) and for assault and battery/excessive force under state law (count IV) against all three defendants. (Doc. 25). Counts III and IV are asserted by Brown only. (*Id.*).

The parties have provided their evidentiary support and fully briefed the pending motions (*see* Docs. 40-41, 43, 45), and they are now under submission. Upon consideration of the evidence and the parties' arguments, and as explained in this memorandum opinion, Defendants' Motions for Summary Judgment are all due to be granted.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).

The party moving for summary judgment always bears the initial responsibility

2

of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(c) requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can meet its burden on summary judgment only by presenting positive evidence that demonstrates the absence of a genuine issue of

material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for a directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the nonmoving party on the issue in question.  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the nonmoving party's case. *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the nonmoving party may either point to evidence in the

4

court record, overlooked or ignored by the movant, sufficient to withstand a directed

verdict, or the nonmoving party may come forward with additional evidence

sufficient to withstand a directed verdict motion at trial based on the alleged

evidentiary deficiency.  However, when responding, the nonmovant can no longer

rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*,

518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561

(1992)).

## III.   STATEMENT OF FACTS[1]

### A.   Sonia Arrives in the Wal-Mart Parking Lot

On June 2, 2005, around 8:30 p.m., Sonia arrived at Wal-Mart on Drake

Avenue in Huntsville, Alabama, in his SUV.  AF No. 1.1.[2]  Several passengers were

---

[1]  Whenever the facts are in dispute, they are stated in the manner most favorable to the non-moving party. *See Fitzpatrick*, 2 F.3d at 1115. Therefore, these are the facts for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

[2]  The designation "AF" stands for admitted fact and indicates a fact offered by Defendants that Plaintiffs have admitted in their written submissions on summary judgment, in their deposition testimony, or by virtue of any other evidence offered in support of their case.  Whenever Plaintiffs have adequately disputed a fact offered by Defendants, the court has accepted Plaintiffs' version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Defendants' statement of facts as set forth in Doc. 41 and responded to by Plaintiffs in Doc. 43. A number following a decimal point corresponds to the particular sentence within the

in the SUV with him, including Travis Jones ("Jones"), Jaivon Scott ("Scott'), Keara

Cook ("Cook"), A.S., and Tony Gonzalez.  AF No. 1.2.  Sonia  parked close to the

entrance of Wal-Mart.  AF No. 2.

All of the occupants of Sonia's SUV, including Sonia and Jones, remained at

Wal-Mart for approximately forty-five minutes to an hour (*i.e.*, until Brown arrived).

AF No. 3.

### B.    Brown Arrives in the Wal-Mart Parking Lot

Around 9:30 p.m., Brown went to Wal-Mart to meet Jones.  AF No. 4.  Brown

was driving Jones's car.  Brown admittedly was playing music in the vehicle and in

a written statement regarding the volume of it she swore:  "My music is loud in the

car."  (Doc. 40 at Ex. AA at D 002841).

Similarly, during her deposition, Brown responded affirmatively that her music

was loud in the car and more generally that her music was loud.  She further testified

that she did not know "what the volume would be to anyone else" and that her

driver's side window was halfway down:

Q.    Not what your volume is, but what's the volume of your music?

A.    Yeah, that's what I'm saying, we're talking to where, like, we

---

numbered statement of facts.  For example, (AF No. 1.2) would indicate the second
sentence of paragraph 1 of Defendants' statement of facts is the subject of the court's
citation to the record.

understand what each other is talking about, so I don't know, like, what the volume would be to anyone else.

Q.    To use your word, I believe you described it as your music was loud in the car; would that be accurate?

A.    Yes.

Q.    Okay.

A.    Yes.

Q.    Your music was loud?

A.    Yes.

Q.    And your window is rolled down?

A.    It's halfway down, just my window.

Q.    The driver's side window?

A.    Yes correct.

(Doc. 40 at Ex. A at 154-55).

When Brown arrived at Wal-Mart playing music, members of the Madison-Morgan County Strategic Counterdrug Team ("STAC team"),[3] including Sergeant Norris, Investigator Anderson, and Investigator Brian Hudson ("Investigator Hudson"), were conducting a drug bust as a result of an undercover drug buy in the

---

[3]    The STAC team consists of law-enforcement officers from various jurisdictions, including Huntsville police officers.

Wal-Mart parking lot.  AF No. 6.  Investigator Hudson was the case agent who had set up the undercover drug buy.  AF No. 7.

Brown pulled behind Sonia's SUV, stopping the wrong way in the driving lane. AF No. 9.  When Brown came to a stop, the music was audible from the car, which was at least 5-6 parking spots away from the STAC team on the opposite side of the driving lane.  AF No. 10.  Jones and Sonia came to Brown's window and they began talking.  AF No. 11.

Brown testified that she was only told once to turn her music down.  (Doc. 40 at Ex. A at 162 ("Q.  Do you know that that was the first time that you were told to turn your music down.  A.  That was the only time I was told to turn my music down.")).[4]  When asked whether the time that she remembered could have been the second or third time instead, she responded, "I don't think so, but it could be possible, but I personally don't think, no[;]" and if it did happen, she didn't hear it.[5]  (*Id.* at 162).

_____

[4]   The record is not entirely clear who Brown heard telling her to turn the music down, but she does recall that she was told to do so by someone other than Sergeant Norris. (Doc. 40 at Ex. A at 161 ("Q.  Okay, so do you know whether or not it was Sergeant Norris that told you to turn your music off?  A.  It wasn't.  Q.  It wasn't?  A. No.  Q.  Who was it?  A.  I don't know his name.")).

[5]  Other witnesses have varying recollections about the number of times Brown was told to turn her music down, ranging from two to three.

As Brown explained the course of events when she and Jones were in her car:

> And we're talking, and he's [*i.e.*, Jones] telling me what to get him out of Wal-Mart, and I told him just go in there and get it.  And  we're sitting there and then we hear somebody yell something.  I don't hear what they're saying because I'm inside the vehicle, but I hear, you know, turn that down now, and I'm, like, who is -- who is he talking to, is he talking to me?  And [Jones] said, yeah, that's the police, he said turn that shit down now, turn it down.  And I didn't turn it down, I looked, I was, like, oh, god, I turned it off.  He had a, you know, remote control, and I turned it off.  And we're still talking --

(*Id.* at 155-56).  Therefore, Brown turned the music down after she confirmed with Jones what the police were telling her to do.

As Investigator Anderson testified regarding noise violations:

Q.     Would you -- so if they would cut it down, you ordinarily wouldn't even issue a citation; you'd just give them a verbal warning?

A.     Basically, yes, sir.  If they complied, yes, sir.

Q.     But if they wouldn't comply or you smelled marijuana or whatever, then it would progress, and there would be an arrest, and --

A.     Yes, sir.

Q.     -- as far as you can recall, that would've involved other charges?

A.     Typically.

(Doc. 40 at Ex. E at 32-33; *see also id.* at Ex. F at 91 ("I don't have the paperwork in front of me or the rules in front of me, but my understanding of it is that the violation

of a city noise ordinance is an arrestable offense, and I think the general practice among individual officers is to write citations.")).

### C.    Sergeant Norris Arrests Brown

Sergeant Norris approached Brown and informed her she could go to jail for playing her music loud.  AF No. 16.  Brown retorted, in substance, "No, you can give me a ticket."  AF No. 17.

At some point during this exchange, Sergeant Norris started yelling and acting very unprofessionally towards Brown.  (Doc. 40 at Ex. A at 168-69).  Brown then "panicked, and [] took [her] phone out, and [she] started recording him [*i.e.*, Sergeant Norris]."  (*Id.* at 169).  Brown informed Sergeant Norris that she was recording him. (*Id.*).

Sergeant Norris then gave Brown clear instructions at least twice to step out of the vehicle.  AF No. 19.  In attempting to comply, Brown initially had some trouble with the door locks because in a panic she cut off the car's engine while the car was in drive.  (Doc. 40 at Ex. A at 172).  As Brown specifically testified:

Q.    How many times did he tell you to get out of the car?

A.    He told me to get the F out of the vehicle twice, to my knowledge, and he said it like that, get the fuck out, get the fuck out, you know, back to back.  And I'm, like, you know, okay, and I tried, but the door -- his -- Travis' [*i.e.*, Jones] car, when you put it [in] drive, it automatically locks the door, and once it's still in drive,

10

you can't mash that button to unlock it.  It won't unlock.

Q.     He tells you to get out of the car?

A.     Uh-huh (Nodding head).

Q.     Do you immediately get out?

A.     I can't.

Q.      Do you immediately get out of the car?

A.     I can't.

(*Id.*).

At some point during the time in which Brown was attempting to get out of the car, Sergeant Norris "reach[ed] in[to] the car to get [the] phone" and later he "smack[ed] [the] phone out of [Brown's] hands, and it f[e]ll[] in the passenger's seat[." (*Id.* at 169-70).  Brown "pick[ed] [the phone] back up, and then once again, [she] put it between [her] legs." (*Id.* at 170).  Sergeant Norris reached for Brown's phone again.  (*Id.*).

Around this same time, Jones, the owner of the car, tried to help Brown "out of the vehicle[.]" (*Id.*).  Sergeant Norris told Jones that "if he c[a]me[] any further, he w[ould] arrest him[,]" and Jones backed away.  (*Id.*).

Brown then asked Sonia to "use [his] phone and record." (*Id.*).  Brown also told Sergeant Norris that she "w[ould] get out [of] the car[,] but that [she] c[ould]n't

11

get out." (*Id.*). Accordingly to Brown, Sergeant Norris then "paused for a minute[.]" (*Id.*).

Sergeant Norris stated that during the time in which Brown was still in the vehicle, it appeared to him that she was locking the car door as he tried to unlock it, and was shifting the car into drive. (Doc. 40 at Ex. C at 100-08, 110-11). It also appeared to Sergeant Norris that Brown was trying to drive off in the car. (*Id.* at 98-105).[6]

Brown eventually turned the power to the car on, put the car in park, and opened the door. (*Id.*). Sergeant Norris "slam[med] the door back" and yelled, "[S]he's trying to run, she's trying to run[.]" (*Id.* at 171). Brown screamed, "[N]o, I'm not[.] [N]o, I'm not." (*Id.*). Brown was also crying. (*Id.*).

Sergeant Norris then sprayed Brown with pepper spray in her mouth, eyes, and face and threw her out of the vehicle. (*Id.*; *id.* at 216). Brown was forcefully removed from the car by her arm and hair and slammed onto the ground. (Doc. 40

---

[6] The court notes that Brown unpersuasively attempts to dispute Sergeant Norris's testimony about what it appeared to him that Brown was doing by pointing to Norris's own testimony in which he indicated that there was no chance that he was "mistaken" or that he "misperceived Brown's actions[.]" (Doc. 43 at 6 ¶¶ 22-23 (citing Doc. 40 at Ex. C at 207-09, 211)). However, the referenced questioning and testimony from Sergeant Norris's deposition substantiates his beliefs, mistaken or otherwise, that Brown was, in fact, resisting arrest, and do not create a material factual dispute as to Sergeant Norris's <u>perceptions of what was happening, even if they were erroneous</u>.

at Ex. A at 215-17).   Investigator Anderson assisted Sergeant Norris in removing Brown from the car.  (Doc. 43 at 8 ¶ 27).

Brown was handcuffed while on the ground.  AF No. 29.  Brown also heard her phone break around the time she was being handcuffed.  (Doc. 40 at Ex. A at 171). Brown testified that Sergeant Norris broke her cell phone.  (*Id.* at 286 ("Q.  What do you understand happened to your cell phone?  A.  I know that Office Norris broke my phone.")).   According to Sonia, Sergeant Norris "picked the phone up out of [Brown's] hand and broke it."  (Doc. 40 at Ex. B at 222).

According to Brown, an audio recording of the exchange with Sergeant Norris was saved on her phone.  (*Id.* at 118-19, 224-25).  Brown further indicated that someone from the department later told her that the broken phone was being held in evidence.  (*Id.*).  Brown never got her phone back.  (*Id.* at 123).

Brown was arrested for disorderly conduct and resisting arrest by Sergeant Norris and transported to jail.  AF No. 30.  Brown claims that her face was burned from the pepper spray and that her knee and elbow were scraped as a result of the arrest.  AF No. 32.1.  Brown did not seek medical attention for her alleged injuries. AF No. 32.2.

### D.    Circumstances Surrounding Sonia's Arrest

Sonia walked out of Wal-Mart around 9:10 p.m., and noticed the STAC team

conducting an undercover drug bust.  AF No. 33.   Investigator Hudson, the case agent in charge of the undercover drug buy, had information that the arrested drug suspects' supplier would be nearby.  AF No. 34.

Sonia was standing toward the front of Brown's car when Sergeant Norris approached Brown.  AF No. 35.  After Sergeant Norris told Brown to get out of the car at least two times and Brown started recording, Sonia backed away from the car. AF No. 36.

Brown instructed Sonia to record, and he did so.  AF No. 37.1.  Sonia claims he recorded three 10-second video clips.  AF No. 37.2.  While recording the last video clip, an officer, *i.e.*, Investigator Hudson, approached Sonia and requested the phone.  AF No. 38.  Sonia  told the officer that he could not have his phone.  AF No. 39.1.  Sonia was then told by the officer that he was under arrest and placed in handcuffs.  AF No. 39.2.

Sonia asked why he was under arrest and the officer stated that Sonia had yelled in the Wal-Mart parking lot.  AF No. 40.1.  Sonia denied that he yelled.  (Doc. 40 at Ex. B at 206 ("But I didn't yell.").

Several other witnesses gave testimony as to this issue with some variations, but none of the additional evidence relied upon by Defendants provides confirmation that Sonia was in fact yelling at the scene.  By way of example only, Investigator

14

Anderson answered that he could not remember "Mr. Sonia yelling anything at Sgt. Norris . . . or at anybody else" at the scene. (Doc. 40 at Ex. E at 38). Jimmy Winn ("Lieutenant Winn") indicated that "during the time [he] was looking at [Investigator Hudson and Sonia]," he never heard any yelling or raised voices. (Doc. 40 at Ex. F at 52).

When asked whether Sonia interfered with his arrest of Brown, Sergeant Norris responded: "Not that I know of. He didn't come get between me and her." (Doc. 40 at Ex. C at 146). When questioned whether Sonia yelled at him and Mr. Brown, Sergeant Norris testified that he did not know and that he had "no idea what was said." (Doc. 40 at Ex. C at 146). Also, while Sergeant Norris indicated that "there was a significant amount of yelling or shouting or a significant amount of noise behind [him]" he "was focused on Mr. Brown" and not able to testify about things that he heard other than relating to himself and Ms. Brown. (*Id.* at 147).

When questioned about Sonia's tone before his arrest, Jones responded that "he wasn't screaming or nothing, just regular. He was like, I go to school for this; I am not breaking any laws." (Doc. 40 at Ex. L at 128-29). Jones further indicated that Sonia "probably wasn't angry[, but] was upset." (*Id.* at 129). Similarly, Scott answered that he did not hear Sonia raise his voice either before or after his arrest. (Doc. 40 at Ex. M at 67).

15

As Cook testified about Sonia's reaction to Brown's arrest:

Q.    What happened after Ms. Brown was maced?

A.    Shaun came and was like, "What are you doing?  What did she do wrong?"  And then the officer started yelling at Shaun.  And then the officer started yelling at Shaun.

Q.    So after Ms. Brown was maced, Shaun came over to Ms. Brown?

A.    He came over to just the incident.  Like she was still in the car, and he was still by the back of the Suburban, but he was talking to the officer.

Q.    A[redacted on transcript] said that she thought Shaun was upset. Did he appear upset to you?

A.    Of course he was.

Q.    And what makes you say that he was upset?

A.    Because he was like -- he wasn't fussing, but his voice was like -- you could hear the frustration, and he was -- he was concerned.

Q.    Was he speaking louder than normal?

A.    Yes.

Q.    Was he yelling?

A.    No.

(Doc. 40 at K at 61-62 (emphasis added)).

Sonia was arrested for disorderly conduct and transported to jail.  AF No. 40.2.

Investigator Hudson was the only officer who physically arrested and handcuffed

16

Sonia; neither Sergeant Norris nor Investigator Anderson assisted in cuffing Sonia. AF No. 41;[7] AF No. 51.

At some point prior to Sonia's arrest, Jones saw Sergeant Norris point at Sonia and "say, Arrest him, too."  (Doc. 40 at Ex. L at 133 ("Q.  Did you hear the officer who arrested Joi Brown point at Shaun Sonia and say, Arrest him too?  A.  Yes."); *id.* at 124 ("A.  Arrest him, too, because they seen Shaun with a phone like this (indicating) or recording.  So they walked over to Shaun, told him they was gonna arrest him.")).  Sometime later at the scene Sonia heard Sergeant Norris state that both he and Brown were "going to jail[.]"  (Doc. 40 at Ex. B at 191).

Sergeant Norris was the only officer present during Sonia's booking, and he was the one responsible for completing the paperwork during that process.  (Doc. 40 at Ex. B at 196, 194).   Sonia testified that Sergeant Norris "initially wrote harassment" as the charge, and that after some discussion with Sonia, Sergeant Norris changed the charge to disorderly conduct.   (Doc. 40 at Ex. B at 194-95).   It is common for one officer to make an arrest and another officer to complete the administrative part of the paperwork for the arrest.  AF No. 55.

Both Investigator Hudson and Sergeant Norris are listed as arresting officers

---

[7] Plaintiffs' evidentiary citations offered in dispute are not responsive to the fact of who made the physical arrest of Sonia.  (Doc. 43 at 9 ¶ 41).

on the Alabama Uniform Arrest Report (the "Report") relating to Sonia's arrest. (Doc. 40 at Ex. T at 1).  Page two of the Report references the "STAC case for [further] details."  (*Id.* at 2).

Investigator Hudson's account of Sonia's arrest for disorderly conduct as set forth in the STAC case report states in part:

> Sgt. Norris was attempting to make an arrest on a female for disorderly conduct.  Shaun Sonia approached Sgt. Norris from behind and acted as if he was going to interfere with the arrest of the female.  I immediately assisted Sgt. Norris.  At this time we did not know if the people we were dealing with was related to the subjects we had just arrested.  I told Sonia to get back and be quiet.  Sonia was being very loud yelling expressing his disagreement to the arrest of the female.  People coming in and out of the Wal-Mart were starting to gather due to the disturbance Sonia and the female were making.  Sonia refused to get back and continued to be loud and boisterous.  I told Sonia he was under arrest for Disorderly Conduct and he  jerked away attempting to use his cell phone.  I took Sonia into custody and secured his cell phone.  Sonia calmed down and apologized for his behavior.  He said that he was just concerned for the female being arrested.

(Doc. 40 at Ex. U at 1).

Sergeant Norris testified that he "did not see Mr. Sonia once [he] started dealing with Ms. Brown."  (Doc. 40 at Ex. C at 145).  He also stated that while he "recall[ed] seeing Investigator Hudson, and [] Mr. Sonia" he did not "have any idea where they were."  (*Id.* at 146).

Investigator Anderson swore in his affidavit that he "did not arrest Sonia,

participate in Sonia's arrest, or have any involvement in the decision to arrest Sonia."

(Doc. 40 at Ex. P ¶ 5).  Investigator Anderson further stated that he "did not observe

the actions of Sonia that led to his arrest[,] "did not observe Sonia's arrest[,]" and

"was not even aware that Sonia was being arrested[.]"  (*Id.* ¶¶ 7-9).[8]

Investigator Hudson signed the criminal complaint against Sonia.  AF No 46.1.

Likewise, Investigator Hudson was listed as the complainant on the arrest warrant for

Sonia.  AF No. 46.2.

Neither Sergeant Norris nor Investigator Anderson directly took Sonia's cell

phone from him at the scene; however Sonia witnessed Sergeant Norris eventually

obtaining possession of his cell phone.  AF No. 56; (Doc. 40 at Ex. B at 223-24 ("Q.

If you didn't see Sgt. Norris put the phone in the bag, how do you know her [i.e.

Brown] phone was in that bag?  A.  Because Norris had my phone from the guy, so

apparently her phone was already in the bag when he took my phone from the other

guy.")).

Investigator Hudson returned Sonia's cell phone to him the next day.  AF No.

48.  Two of the three video clips that Sonia had recorded on the date of the arrests

were no longer on his phone.  (Doc. 40 at Ex. B at 258 ("I don't know who deleted

---

[8]   Sonia's efforts to show knowledge on the part of Anderson about the circumstances of his arrest are non-responsive and/or ineffective.  (*See, e.g.*, Doc. 43 at 11 ¶¶ 49-50).

it but I know when I got the phone back I only had one video.")).

###### E.   The Prosecution of Brown and Sonia

Brown was found guilty of resisting arrest and not guilty of disorderly conduct in the District Court of Madison County on September 28, 2005.  AF No. 57.1.  Brown appealed the guilty verdict on the resisting arrest charge to the Circuit Court of Madison County on November 7, 2005.  AF No. 57.2.

The resisting arrest charge against Brown was nolle prossed on November 26, 2006, while on appeal to the circuit court.  AF No. 58.  The disorderly conduct charge against Sonia was nolle prossed in the District Court of Madison County on August 25, 2005.  AF No. 59.

## IV.   ANALYSIS

### A.   Qualified Immunity

Defendants Norris and Anderson assert that qualified immunity bars Plaintiffs' § 1983 claims brought against them in their individual capacities.  "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known."  *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks and citations omitted).  "To receive qualified immunity, a government official

20

first must prove that he was acting within his discretionary authority." *Id.* at 1357-58.

This is a two-part test.  Under the first step, "the defendant must [prove that he or she was] performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004).  Next, the defendant must prove that he or she was "executing that job-related function."  *Id.* at 1267.

Here, there can be no doubt that making an arrest and securing an arrestee are within the legitimate duties of being a police officer.  *See, e.g., Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (finding that "there can be no doubt" that an officer acted in his discretionary capacity when making an arrest); *Danley v. Allen*, 540 F.3d 1298, 1306 (11th Cir. 2008) (finding that jailers were acting within discretionary authority when they administered pepper spray to a plaintiff).  Moreover, Plaintiffs concede that Defendants Norris and Anderson have shown that they were "acting within the scope of [their] discretionary authority[.]" (Doc. 43 at 15).  Accordingly, the court now turns to Plaintiffs' burden on qualified immunity.  "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358.

The Supreme Court has, until recently, required a two-part inquiry to determine

the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Under the *Saucier* test, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002).

If, under the plaintiff's allegations, the defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Cottone*, 326 F.3d at 1358 (quoting *Saucier*, 533 U.S. at 201).  The "clearly established" requirement is designed to assure that officers have fair notice of the conduct which is proscribed.  *Hope*, 536 U.S. at 739.  This second inquiry ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206.

The "unlawfulness must be apparent" under preexisting law.[9]  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted).  Therefore, a temporal requirement exists related to this inquiry.  More particularly, a plaintiff must show that a reasonable public officer would not have believed her actions to be lawful in light of law that was clearly established at the time of the purported violation.  *See*

---

[9]  Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this litigation. *Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003) ("As we have stated, only Supreme Court cases, Eleventh Circuit caselaw, and Georgia Supreme Court caselaw can 'clearly establish' law in this circuit.") (citation omitted).

*Anderson*, 483 U.S. at 639 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action[], assessed in light of the legal rules that were clearly established <u>at the time</u> it was taken[.]") (internal quotations and citations omitted) (emphasis added); *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("If the law <u>at that time</u> did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.") (emphasis added); *Brosseau*, 543 U.S. at 198 ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law <u>at the time</u> of the conduct.") (emphasis added); *see also Johnson v. Clifton*, 74 F.3d 1087, 1093 (11th Cir. 1996) ("We know of no [preexisting] case which might have clearly told Clifton that he could not take the disciplinary action indicated by an investigation which was initiated before he even knew about the allegedly protected speech, and in circumstances where the public concern implication was doubtful.").

The *Saucier* framework was recently made non-mandatory by the Supreme Court in *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009), in which the Court concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory."  Thus, "judges of the district courts and

the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Despite the Supreme Court's recent modification of *Saucier*'s analytical process, the substantive analysis remains unchanged; an officer is entitled to qualified immunity protection as long as he "could have believed" his conduct was lawful. *Hunter v. Bryan,* 502 U.S. 224, 227 (1991). Therefore, to deny immunity, Plaintiffs must affirmatively demonstrate that "no reasonable competent officer would have" acted as defendants did. *Malley v. Briggs,* 475 U.S. 335, 341 (1986). Regardless of the new-found discretion in applying the *Saucier* framework, the court, in this particular instance, elects to follow the traditional approach to the qualified immunity defense first by addressing the constitutionality question and then focusing upon whether Plaintiffs have established that Defendants Norris and Anderson violated clearly established law. As to each separate inquiry, the court concludes the Plaintiffs have not met their burden.

### 1.    Plaintiff Brown's Federal Claims Against Defendants Norris and Anderson

Brown's constitutional claims asserted against Defendants Norris and Anderson are for false arrest (count I) and excessive force (count III). Sergeant

Norris's liability is premised upon his arrest of Brown without probable cause and for assaulting and battering her in performing the arrest.   (Doc. 25 ¶¶ 18, 30). Investigator Anderson's liability is based upon his active participation in the arrest, the use of excessive force , and his "fail[ure] to protect Brown despite the opportunity to do so."  (*Id.* ¶¶ 19, 31).

> a.    **False Arrest**

"Under the Fourth Amendment, an individual has a right to be free from 'unreasonable searches and seizures.'"  *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007).  "In Fourth Amendment terminology, an arrest is a seizure of the person, and the 'reasonableness' of an arrest is, in turn, determined by the presence or absence of probable cause for the arrest."  *Skop*, 485 F.3d at 1137 (internal citation omitted).  "While an officer who arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity."  *Skop*, 485 F.3d at 1137.  "Thus, even if we determine that the officer did not in fact have probable cause, we apply the standard of 'arguable probable cause,' that is, whether 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[ ] *could have believed* that probable cause existed to arrest.'"  *Id.* (citation omitted).

Brown was arrested for two separate violations:  disorderly conduct and

resisting arrest.  If no Fourth Amendment constitutional violation exists as to either, then qualified immunity bars Brown's false arrest claim.  *See, e.g., Skop*, 485 F.3d at 1138  ("If Officer Brown possessed probable cause or arguable probable cause to arrest Skop <u>for either</u>, he is entitled to qualified immunity.") (emphasis added).

### i.    Disorderly Conduct

Regarding count I, Brown maintains that her arrest for disorderly conduct on the basis of the music that she was playing was improper under the Fourth Amendment because it was not loud enough to constitute unreasonable noise within the meaning of Ala. Code § 13A-11-7.   Section 13A-11-7 specifically provides:

> (a) A person commits the crime of disorderly conduct if, <u>with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof</u>, he:
>
>> 1) Engages in fighting or in violent tumultuous or threatening behavior; or
>>
>> (2) <u>Makes unreasonable noise</u>; or
>>
>> (3) In a public place uses abusive or obscene language or makes an obscene gesture; or
>>
>> (4) Without lawful authority, disturbs any lawful assembly or meeting of persons; or
>>
>> 5) Obstructs vehicular or pedestrian traffic, or a transportation facility; or
>>
>> (6) Congregates with other person in a public place and

refuses to comply with a lawful order of the police to disperse.

(b) Disorderly conduct is a Class C misdemeanor.

Ala. Code § 13A-11-7 (emphasis added).

A dismissal of Brown's false arrest claim against Defendants Norris and Anderson for disorderly conduct is proper because no constitutional violation took place. Here, at a minimum, Defendants Norris and Anderson had arguable probable cause to arrest Brown for disorderly conduct as Brown admits that she was playing music that was loud in the car and that the driver's side window was rolled down half-way. Moreover, there is no dispute that Defendants Norris and Anderson personally heard the music that Brown was playing and that they witnessed first-hand the arguably unreasonably noisy conduct. "If an officer has probable cause to believe that an individual has committed <u>even a very minor criminal offense in his presence</u>, he may, <u>without violating the Fourth Amendment</u>, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (emphasis added).

As the Eleventh Circuit explained in another false arrest case stemming from a charge of disorderly conduct under Florida law:

> In making this determination, the central issue is whether, on the date of Gold's arrest, <u>the officers had arguable probable cause to believe that Gold had committed the offense of disorderly conduct</u>. *See Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir.1990). The standard for

27

> arguable probable cause is "whether a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law." *See Eubanks v. Gerwen*, 40 F.3d 1157, 1160 (11th Cir.1994). <u>As we have emphasized before, arguable probable cause is distinct from actual probable cause</u>. *See Post*, 7 F.3d at 1559.

*Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997) (emphasis added). The distinction between arguable versus actual probable cause is significant because it "'gives ample room for mistaken judgments'" and for "reasonable error[.]" 121 F.3d at 1446 (citations omitted); *see also Scarbrough v. Myles*, 245 F.3d 1299, 1302-03 (11th Cir. 2001) ("Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors.").[10]

Thus, even if a state official acts only "in an *arguably* reasonable way" based upon preexisting law, then qualified immunity protects him. *See, e.g., Marsh v. Butler County*, 268 F.3d 1014, 1031 n.8 (11th Cir. 2001) ("[I]f a sheriff responds in an *arguably* reasonable way to unsafe jail conditions, the sheriff will avoid suit pursuant to the defense of qualified immunity.") (citation omitted); *see also id.*

---

[10] Thus, *Scarbrough* forecloses Brown's argument that qualified immunity cannot apply to Defendants Norris and Anderson in their arrest of her due to a lack of any intent on her part to engage in any disorderly conduct.

28

("Qualified immunity is meant to allow government officials to act with 'independence and without fear of consequences' when the law is not clearly established.") (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)).

"Arguable probable cause exists if, under all of the facts and circumstances, an officer reasonably <u>could</u> – not necessarily <u>would</u> – have believed that probable cause was present." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004) (emphasis added); *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998) ("Taking the facts of the case in the light most favorable to the plaintiffs, we conclude that the EPD officers had arguable probable cause to arrest Anderson[11] for disorderly conduct on March 24th, that is, that the officers could reasonably have believed that Anderson's actions on that date violated Alabama's disorderly conduct statute.") (footnote omitted); *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) ("In order to be entitled to qualified immunity from a Fourth Amendment claim, an officer need not have actual probable cause but only 'arguable probable cause,' *i.e.*, the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed.").

Additionally, the arguable probable cause determination is made without

---

[11] Anderson was a traveling minister who admitted "that he was speaking loudly enough to be heard across the street, but not so loudly as to be heard over the noise of passing trucks." *Redd*, 140 F.3d at 1380.

reference to a particular officer's subjective feelings.   As the Eleventh Circuit explained in *Lee*, "[i]n determining whether arguable probable cause exists, '[w]e apply an objective standard, asking 'whether the officer's actions are objectively reasonable . . . regardless of the officer's underlying intent or motivation.'" 284 F.3d at 1195 (emphasis added) (citations omitted).   Under this court's assessment, this language in *Lee* means that even if Sergeant Norris was angry that Brown was recording him with her cell phone and that was what motivated him (completely or in part) to charge her with disorderly conduct for the loud music, then qualified immunity still protects him so long as, from an objective standpoint, a "link" exists between the charge of disorderly conduct and Brown's actions in playing loud music with her window rolled down.  *Cf. Williamson v. Mills*, 65 F.3d 155 (11th Cir. 1995) ("What was fatally missing from Mills's [*i.e.*, the officer] knowledge, however, was a link between the suspected criminal activity and Williamson.") (emphasis added);[12] *Childs v. Dekalb County*, 286 Fed. Appx. 687, 697 (11th Cir. 2008) ("The facts in this

_____

[12]   In *Mills*, Williamson was arrested for "[t]aking photographs at a public event" including "some of the undercover officers." 65 F.3d at 158, 156.  In rejecting the qualified immunity defense asserted by Mills, the Eleventh Circuit explained that "[t]he mere fact that Williamson's photographs could have been used for unlawful activity-such as carrying out a death threat against Pavan [one of the undercover officers]-is not enough to establish even arguable probable cause for Williamson's arrest unless Mills had some datum to connect Williamson to the death threats or other crime."  65 F.3d at 158.

case, where the defendants admittedly detained the plaintiffs for [merely] writing down Officer Gorman's license plate number in a public parking lot, are materially indistinguishable from *Williamson*.").  Therefore, because even taken in the light most favorable to Brown, a reasonable officer could conclude that he had arguable probable cause to arrest her for disorderly conduct for playing loud music, qualified immunity must apply to her claim of false arrest.

A dismissal of Brown's false arrest claim against Defendants Norris and Anderson is alternatively appropriate on qualified immunity grounds because she cannot show that clearly established law provided them with fair warning that their conduct was illegal.  Put differently, the record on summary judgment, relating to the decision to arrest Brown for disorderly conduct due to her (admittedly) playing loud music, falls far short of showing any apparent unlawfulness <u>at the time</u> of the conduct.  *See Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003) ("The unlawfulness must have been apparent. . . . [whether through on-point binding authority] or a general constitutional rule already identified in the decisional law[.]") (citing *Anderson*, 483 U.S. at 639-40); *see also Brosseau*, 543 U.S. at 198 ("It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'") (quoting *Saucier*, 533 U.S. at 201).

31

This fair warning requirement can be met through either (1) pointing to a case with materially similar facts holding that the conduct engaged in was illegal; or (2) demonstrating that a pertinent federal statute or federal constitutional provision is specific enough to demonstrate the conduct was illegal, even in the total absence of case law.  *Storck v. City of Coral Springs*, 354 F.3d 1307, 1317 (11th Cir. 2003) (citations omitted).  Brown is unable to meet either prong.

Concerning the second method first, this is not an "obvious clarity" case with respect to the actions of Defendants Norris and Anderson.  *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (footnote omitted).  More specifically, the decision of Defendants Norris and Anderson  to arrest Brown for disorderly conduct does not present a situation in which a "broad statement[ ] of principle in caselaw [that is] not tied to particularized facts . . . can clearly establish law applicable in the future to different sets of detailed facts."[13]  *Vinyard*, 311 F.3d at 1351 (citation omitted).

_____

[13]  "This case does not present the other kind of 'obvious clarity' case where a 'broad statement[ ] of principle in caselaw [that is] not tied to particularized facts ... can clearly establish law applicable in the future to different sets of detailed facts.'"  *Storck*, 354 F.3d at 1307 n.6 (citing *Vinyard*, 311 F.3d at 1351).  *Vinyard* explains the contours of this obvious clarity subset as:  "For example, if some authoritative judicial decision decides a case by determining that 'X Conduct' is unconstitutional *without tying* that determination to a particularized set of facts, the decision on 'X Conduct' can be read as having clearly established a constitutional principle:  put differently, the precise facts surrounding 'X Conduct' are immaterial to the violation."  311 F.3d at 1351 (footnote omitted).

As for the materially similar prior case law fair warning alternative, Brown has not provided the court with materially similar controlling case authority establishing the unlawfulness of the actions of Defendants Norris and Anderson.[14]   Relatedly, none of the cases relied upon by Brown clearly establishes that her actions, in playing loud music with a window rolled down, "did not constitute legally proscribed disorderly conduct" under Alabama law.  *Gold*, 121 F.3d at 1446.

Indeed, as Plaintiffs have recognized, "[t]here is not a single case even suggesting, let alone holding, that music, let alone music at the volume here, is a violation of the disorderly conduct statute."  (Doc. 43 at 19 (citations to disorderly conduct decisions involving non-music situations omitted)).  Conversely and for the purposes of qualified immunity, there is no Alabama authority clearly establishing that playing loud music does <u>not</u> violate the disorderly conduct statute, and thus Defendants Norris and Anderson are entitled to immunity.

As the Eleventh Circuit further reasoned in determining that qualified immunity applied in *Gold*:

> <u>Given that what constitutes legally proscribed disorderly conduct is subject to great subjective interpretation of specific facts</u>-for example, the words used, the tone used, the decibels used, and the reaction of

---

[14]  The court has not been able to independently locate any such controlling authority either.

onlookers-we are constrained to conclude that a reasonable officer in the same circumstances and possessing the same knowledge as the officers in this case could have reasonably believed that probable cause existed to arrest Gold for disorderly conduct.  The evidence, viewed in the light most favorable to Gold, reflects that Gold twice used profanities in a loud voice, in a public place, and in the presence of others. <u>At the time, no cases clearly established that those actions did not constitute legally proscribed disorderly conduct</u>.

*Gold*, 121 F.3d at 1446 (emphasis added).

The status of arresting someone for disorderly conduct for playing loud music in public under Alabama law is comparable to the ill-defined nature of disorderly conduct for loudly using profanity in public as analyzed in *Gold* under Florida law. *See also Redd*, 140 F.3d at 1380 (reversing district court's denial of qualified immunity to police officers who arrested traveling minister for disorderly conduct under Alabama law for preaching too loudly).  Therefore, given the elastic nature of the arguable probable cause standard to be applied in assessing the constitutionality of their arrest of Brown for disorderly conduct,  Defendants Norris and Anderson have, at a minimum, shown  the lack of clarity of the then applicable law to their actions and, relatedly, Brown cannot satisfy the fair warning requirement. Accordingly, for all these reasons, Brown cannot meet the clearly established law/fair warning requirement to the qualified immunity defense on her false arrest for disorderly conduct claim, and Defendants Norris and Anderson are entitled to

summary judgment as to this claim.

## ii.    Resisting Arrest[15]

The same lack of any constitutional violation and the failure to satisfy either alternative fair warning requirement is true regarding Brown's false arrest claim premised upon the charge of resisting arrest.  In particular, the fact that Sergeant Norris <u>believed</u> that Brown was ignoring his instructions for her to get out of the car, which she admits he gave at least twice, is critical.[16]  *See Crosby*, 394 F.3d at 1334 (explaining that qualified immunity requires viewing "the situation through the eyes of the officer on the scene who is hampered by incomplete information").  Therefore, because Sergeant Norris's perception, even if misguided, makes his conduct in charging Brown for resisting arrest at least <u>arguably reasonable</u>,[17] *a fortiori*, Brown

---

[15]  As pointed out in *Skop*, because the court has already determined that qualified immunity defeats Brown's false arrest claim premised upon disorderly conduct, it is not necessary to analyze the charge of resisting arrest.  However, the court chooses to address resisting arrest as an alternative basis for its false arrest-qualified immunity holding.

[16]  Brown's efforts to dispute Sergeant Norris's testimony about his perceptions at the scene of the arrest with what she believes he understood as well as her interpretations of his non-verbal actions are unavailing.

[17] *See, e.g., Magee v. City of Daphne*, No. 05-0633-WS-M, 2006 WL 3791971, at *10 (S.D. Ala.  Dec. 20, 2006) ("By refusing lawful commands, Magee was actively resisting arrest.").  While the court has reached the constitutional question here and found no violation, the other important point is that to the extent the Fourth Amendment evaluation involves close calls, the less likely that clearly established law

cannot show that he violated clearly established law when he (with the assistance of Officer Anderson) arrested her for resisting arrest.  Accordingly, Defendants Norris and Anderson are entitled to qualified immunity on Brown's federal false arrest count as analyzed with respect to both the charge of disorderly conduct and the charge of resisting arrest.

**b.     Excessive Force**[18]

Brown primarily points to the use of pepper spray against her to support her excessive force claim as set forth in count III.  "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from

---

exists with respect to the challenged conduct.  *See, e.g., Pearson*, 129 S. Ct. at 818 ("There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.").  Relatedly, Plaintiffs have failed to offer any broad statements of law or materially similar controlling case authority that would have provided fair warning to Defendants Norris and Anderson that their actions were unconstitutional at the time they arrested Brown for resisting arrest.

[18]  The court notes that, because both sides have analyzed the federal excessive force claims under the Fourth Amendment, it will likewise do so.  *See Burkett v. Alachua County*, 250 Fed. Appx. 950, 952 n.5 (11th Cir. 2007) ("Because the Correctional Officers do not argue that Burkett's claim concerns acts separate from his seizure and do not challenge the district court's use of a Fourth Amendment analysis, we will assume-based on the circumstances of this particular case-that Burkett was still being seized; and we will analyze Plaintiff's claim under the Fourth Amendment."); *see also Hicks v. Moore*, 422 F.3d 1246, 1253 n.7 (11th Cir. 2005) ("The precise point at which a seizure ends (for purposes of Fourth Amendment coverage) and at which pretrial detention begins (governed until a conviction by the Fourteenth Amendment) is not settled in this Circuit."); *Hicks*, 422 F.3d at 1253 n.7 ("Plaintiff asserts protection under the Fourth Amendment standard, which is commonly an easier standard for a plaintiff to meet.").

the use of excessive force in the course of an arrest." *Vinyard*, 311 F.3d at 1347. "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, <u>without regard to his underlying intent or motivation</u>." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004) (emphasis added) (citation omitted).

"*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Lee*, 284 F.3d at 1198. The reasonableness probe also involves an assessment of "the injury inflicted." *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997) ("The excessive force standard is based on reasonableness. It looks to the need for force, the amount of force used, <u>and the injury inflicted</u>.") (emphasis added) (citation omitted).

Furthermore "[i]n making an excessive force inquiry, we are not to view the matter as judges from the comfort and safety of our chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts. We must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a

split-second decision between action and inaction in circumstances where inaction could prove fatal." *Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir. 2004) (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *Kesinger*, 381 F.3d at 1248-50; *Garrett v. Athens-Clarke County*, 378 F.3d 1274, 1279 (11th Cir. 2004)).

Brown nearly exclusively relies upon the Eleventh Circuit's decision in *Vinyard* to show not only the existence of a constitutional violation but also the satisfaction of the fair warning requirement for the use of pepper spray against her.[19]

---

[19] The court notes that Plaintiffs cite to *Walker v. City of Riviera Beach*, 212 Fed. Appx. 835 (11th Cir. 2006), in support of the excessive force claim. However, because *Walker* is an unpublished decision, it is not binding on the Eleventh Circuit or this court, is comparable to decisions issued by other district courts, and therefore, at best, is only persuasive authority. *See, e.g., Baker v. Birmingham Board of Education*, 531 F.3d 1336, 1338 (11th Cir. 2008) ("[B]ecause Palmer is an unpublished decision, it is not binding precedent.") (citing *Twin City Fire Ins. Co., Inc. v. Ohio Cas. Ins. Co., Inc.*, 480 F.3d 1254, 1260 n.3 (11th Cir. 2007); 11th Cir. Rule 36-2). As merely persuasive authority, it cannot constitute clearly established law. Also, temporally *Walker* cannot serve as clearly established law because its issuance post-dates the complained of conduct. (*See* Doc. 43 at 26 (As Plaintiffs recognize, "[b]ecause *Walker* was decided after this incident it cannot be a controlling materially similar case.")).

Plaintiffs also cite to *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1245 (11th Cir. 2003). In *McCormick*, the Eleventh Circuit upheld the use of "pepper spray to a suspect of a violent felony without first giving the suspect a warning and an opportunity to submit." *Id.* at 1245. In addition to being a suspected violent felon, McCormick was "armed with [a] stick" at the scene. *Id.* Citing to *Vinyard*, the Eleventh Circuit determined that "Officer Welker's use of a nonlethal weapon that would impose no lasting injury on McCormick was proportional to the threat posed by McCormick." *Id.* To the extent that *McCormick* suggests that the use of pepper spray against Brown was out of proportion under the circumstances, such

In *Vinyard*, the plaintiff was arrested at a party and was driven to the police station by the defendant. En route to the station, the defendant stopped on a secluded road, opened the plaintiff's door and sprayed her in the face with pepper spray. *Id.* at 1343-1344. The plaintiff had been secured in handcuffs, kept her feet on the floor and presented no threat to the officer. *Id.* Based on these facts, the Eleventh Circuit held that "it is abundantly clear . . . that during the jail ride [the defendant] used force that was plainly excessive, wholly unnecessary, and, indeed, grossly disproportionate under *Graham*." *Id.* at 1349. The plaintiff posed no threat to the officer, was secured in the rear of the car, and it was only a short ride to the jail. *Id.*

Because the facts of *Vinyard* are significantly distinguishable from those in this case, *Vinyard* does not show a constitutional violation in the amount of force used on Brown in securing her arrest and regardless cannot clearly establish the unlawfulness of Defendants Norris's and Anderson's conduct. One distinction is that Brown was not handcuffed at the time she was pepper sprayed. Indeed, Brown was not in a patrol car, but rather in Jones's vehicle, and she was not yet secured.

Additionally, an open window to the car door meant that, at least partially, no barrier existed between Sergeant Norris and Brown. Furthermore, Brown did not get

an implication from *McCormick* cannot clearly define the law in this case because the facts from the two situations are so materially different.

out of the vehicle immediately and appeared to Sergeant Norris to be locking the door and attempting to leave.  Under these differing circumstances, *Vinyard* does not establish that Brown was treated in an unconstitutional manner.  *Cf. id.*, 311 F.3d at 1348 ("Courts have consistently concluded that using pepper spray is excessive force in cases where the crime is a minor infraction, <u>the arrestee surrenders, is secured,</u> and is not acting violently, and there is no threat to the officers or anyone else.") (emphasis added) (footnote omitted); *id.* ("Courts have consistently concluded that using pepper spray is reasonable, however, <u>where the plaintiff was either resisting arrest or refusing police requests,</u> such as requests to enter a patrol car or go to the hospital.") (emphasis added) (footnote omitted); *see also Griffin v. Runyon*, 213 Fed. Appx. 938, 939 (11th Cir. 2007) ("And when Griffin [suspected of criminal trespass] ignored the deputy's commands to halt and attempted to flee, the deputy's use of pepper spray to subdue Griffin did not amount to excessive force under the Fourth Amendment.").

Moreover, the relatively minor nature of Brown's injuries favors the reasonableness of the force used to secure her.  Here, Brown complains that her face was burned from the pepper spray and that her knee and elbow were scraped as a result of the arrest.  *Cf. Smith v. Mattox*, 127 F.3d 1416, 1420 (11th Cir. 1997) ("But, assuming as we must that Smith was offering no resistance *at all*, the considerable

effort and force <u>inferable from the grunt, Smith's sensation of a blow, and the broken arm</u> was obviously unnecessary to restrain even a previously fractious arrestee.") (emphasis added); *Priester v. City of Riviera Beach*, 208 F.3d 919, 923-34, 926-27 (11th Cir. 2000) (finding unlawfulness of conduct readily apparent where officer released police dog to attack plaintiff who was lying on ground, did not pose a threat, and was not attempting to flee or resist arrest); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (finding unlawfulness of conduct readily apparent when officers beat handcuffed plaintiff even though he did not resist, attempt to flee, or struggle).

Unlike the plaintiffs in *Smith*, *Priester*, and *Slicker*, the injuries that Brown sustained as a result of her arrest were minor and/or even *de minimis*. As explained by the Eleventh Circuit regarding the application of the *de minimis* rule to a portion of the plaintiff's excessive force claims in that case:

> Vinyard also claims that Stanfield's actions prior to handcuffing Vinyard at the arrest scene and upon her arrival at the jail constituted excessive force. <u>We disagree and conclude that Stanfield's force used and any injury sustained at those two points were de minimis and not excessive.</u> *See* decisions where force and injury were held to be de minimis and not excessive, *Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000) (grabbed plaintiff and shoved him a few feet against vehicle, pushed knee in back and head against van, and handcuffed him); *Gold v. City of Miami*, 121 F.3d 1442, 1444 (11th Cir.1997) (handcuffed too tightly and too long); *Jones v. City of Dothan*, 121 F.3d 1456, 1458 (11th Cir.1997) (slammed plaintiff against the wall, kicked his legs apart

and required plaintiff to raise hands above head as officers carried out arrest); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1556 (11th Cir.1993) (pushed plaintiff against wall while handcuffed), modified, 14 F.3d 583 (11th Cir.1994); *see also Lee*, 284 F.3d at 1199-1200 (discussing these de minimis force cases). In *Saucier*, the Supreme Court approved again the observation that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." 533 U.S. at 209, 121 S. Ct. 2151 (internal quotation marks omitted). <u>Thus, under the first prong of *Saucier*, we affirm the district court's grant of summary judgment in favor of Stanfield as to Vinyard's claims of excessive force at the arrest scene and at the jail. A strong argument exists that even Stanfield's grabbing of Vinyard and the minor bruising during the jail ride constitute de minimis force and injury</u> in the same way as in *Nolin*, 207 F.3d at 1258 n.4. What distinguishes Stanfield's force during the jail ride from the de minimis force and injury cases is the use of pepper spray.

*Vinyard*, 311 F.3d at 1348 n.13 (emphasis added). Therefore, based upon *Vinyard*, as it pertains to Brown's scrapes on her knee and elbow, no constitutional violation occurred in securing her and making the physical arrest in light of the *de minimis* force rule.

Moreover, while the burn on Brown's face from the pepper spray is perhaps a more significant injury than a scrape, the severity was not to such a serious degree that she sought medical attention for it. Also, the pepper spray was more reasonably applied in conjunction with securing Brown as opposed to the unreasonable application of it to an arrestee that had already been secured as occurred in *Vinyard*. Therefore, for all these reasons, the court concludes that the use of pepper spray

against Brown under these particular circumstances was not unconstitutional.

Alternatively, given the closeness of the constitutional question on the use of pepper spray against Brown, then, *a fortiori*, she cannot show that clearly established law proscribed the challenged conduct.  Concerning fair warning, *Vinyard* stands far from the proposition that the use of pepper spray to effectuate an arrest is unconstitutional per se and regardless does not dictate that the actions of Sergeant Norris in using the pepper spray clearly violated Brown's constitutional rights under the totality of the circumstances.  *See, e.g., Vinyard*, 311 F.3d  at 1348 ("Indeed, pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee.").  Furthermore, Brown does not rely upon any other controlling authority with materially similar facts in which the use of pepper spray was unconstitutional to satisfy the fair warning requirement.

Additionally, the Eleventh Circuit has made it clear that even a conclusion that the application of pepper spray on Brown and slamming her down might have been unnecessary under the circumstances does not prevent qualified immunity from attaching to the complained conduct:

> The facts viewed in the light most favorable to Mr. Jones show that Estress and Wright "slammed" Mr. Jones against the wall, kicked his legs apart, required him to raise his arms above his head, and pulled his wallet from his pants.  They also show that Mr. Jones experienced pain from having to lift his arms since he had previously suffered a

stroke, and that he experienced pain in his arthritic knee from having his legs kicked apart. They further show that he received minor medical treatment for pain in his arthritic knee three days after the incident.

These facts resemble those involved in *Post*. There, an officer put the plaintiff into a choke-hold and pushed him into a wall. <u>We held that while the pushing may have been unnecessary, the application of the excessive force standard would not inevitably lead an official in the officer's position to conclude that the force was unlawful since the amount of force was minimal.</u> *See id.* at 1560. We reach a similar holding here. <u>While use of force against Mr. Jones may have been unnecessary, the actual force used and the injury inflicted were both minor in nature.</u> <u>Given such variables, the application of the excessive force standard would not inevitably lead an official in Estres's and Wright's position to conclude that the force was unlawful.</u> Accordingly, Estress and Wright are entitled to qualified immunity on Mr. Jones's excessive force claim.

*Jones*, 121 F.3d at 1460-61 (emphasis added); *see also Post*, 7 F.3d at 1560 ("That the amount of force Sellers-Sampson used, <u>even if unnecessary</u>, was enough to violate the law <u>was not plain; reasonable doubt existed, and still exists</u>, on whether this amount of unnecessary force was unlawful.") (emphasis added).[20]

Finally, this lawsuit is not one that comes within that "slender category of cases in which the unlawfulness of the conduct is so readily apparent even without clarifying case law." *Smith*, 127 F.3d at 1420. Accordingly, for all these reasons, Brown cannot meet the clearly established law/fair warning requirement to the

---

[20] The qualified immunity analysis of the excessive force claims in *Jones* and *Post* seems to blend together the constitutional and plainly established law inquiries, rather than to address each area separately.

qualified immunity defense on her excessive force claim, and Defendants Norris and

Anderson are entitled to summary judgment on her federal excessive force claim.[21]

### 2. Plaintiff Sonia's Federal False Arrest Claim Against Defendants Norris and Anderson

As alleged in the complaint, Sonia has one § 1983 claim for false arrest that he

has asserted against Sergeant Norris only:

> On or about June 2, 2005, defendant, Norris, acting under color of law
> within the meaning of 42 U.S.C. § 1983, arrested Sonia without
> probable cause, thereby depriving plaintiff of his rights under the Fourth
> and Fourteenth Amendments to the Constitution of the United States in
> violation of 42 U.S.C. § 1983. Specifically, he violated plaintiff's right
> to be free from unlawful seizure.

(Doc. 25 ¶ 20). Unlike Brown's federal claims, the court does not see where Sonia

has alleged that Investigator Anderson actively participated in or failed to prevent

––––––––––––––––––

[21] The court notes alternatively that to the extent that Brown does have a viable
false arrest claim, then her claim of excessive force would be subsumed within the
false arrest count:

> In this case, <u>damages recoverable on Williamson's false arrest claim
> include damages suffered because of the use of force in effecting the
> arrest</u>. *See Hamm v. Powell*, 874 F.2d 766, 770 (11th Cir.1989). Under
> these circumstances, <u>Williamson's excessive force claim is subsumed in
> his false arrest claim</u>, and thus we find no reversible error in the district
> court's grant of summary judgment on the excessive force claim as a
> discrete claim.

*Mills*, 65 F.3d at 158-59 (emphasis added).

Sonia's allegedly false arrest under federal law.[22]  However, because the parties have briefed Sonia's § 1983 claim to include both Defendants Norris and Anderson, the court will likewise address both individual defendants.

As a preliminary matter, the court notes that a material factual dispute exists over whether Sonia engaged in conduct at the scene that would support the arguable probable cause standard in arresting him for disorderly conduct.  In particular, while Investigator Hudson contends that Sonia was yelling about the arrest of Brown, the testimony of Sonia and other witnesses refutes this fact.  If a jury were to believe that Sonia was not yelling at the scene, then all he would have been doing was openly recording the incident in the parking lot on his cell phone.  Such an innocuous act could not, even under the arguable probable cause standard, support a charge of disorderly conduct.  Therefore, <u>if Investigator Hudson had been sued</u> for false arrest in this case, then the court would have mostly likely denied any qualified immunity defense as to his active participation in the arrest of Sonia because to rule otherwise would have required the court to improperly make credibility determinations and to weigh the evidence at the summary judgment stage.  However, the roles that Defendants Norris and Anderson played in the arrest of Sonia <u>as supported by the</u>

_____

[22]  Brown has asserted a state claim for false arrest/false imprisonment against "defendant Norris, with the active participation of defendant Anderson[.]" (Doc. 25 at 5 ¶ 25).

<u>evidence in the record</u> are different from that of Investigator Hudson and also from each other.

Like Brown, Sonia cannot sustain his federal false arrest claim for either individual defendant because he cannot show unconstitutional conduct, whether by active participation and/or under a failure to intervene theory. Alternatively, Sonia's claim fails because he cannot satisfy the fair warning requirement of the qualified immunity defense.

Turning to Sergeant Norris's actions first, while the record definitely shows some degree of personal participation on his part in that he was responsible for booking Sonia, Sergeant Norris did not effectuate Sonia's arrest at the scene, rather <u>Investigator Hudson</u> did. Further, as Sonia admits, having a different officer complete the paperwork relating to another officer's physical arrest is a common law enforcement practice.

Moreover, mere isolated involvement in the events prior to an arrest in the form of statements such as "they are going to jail" and "arrest him too" by one officer (*i.e.*, Sergeant Norris) when another officer, who was also at the scene and who, based upon his own independent personal observations, finds probable cause and actually makes the physical arrest (*i.e.*, <u>Investigator Hudson</u>), does not render the first officer constitutionally liable for false arrest, even assuming, as the court does here, that the

47

first officer was angry at the plaintiff for using his phone as a recording device, wanted him to be arrested, and spontaneously stated "arrest him too."

What evidence is lacking here is some proof that Sergeant Norris conspired with Investigator Hudson to get him to fabricate a charge against Sonia or that Sergeant Norris was aware of Investigator Hudson's purported lie about Sonia's yelling at the scene and yet still proceeded to book him and complete all the necessary paperwork to document his arrest. In other words the issue is not so much whether Sergeant Norris participated in any part of the arrest, *i.e.*, the booking of Sonia, but instead whether he was involved in a cover up of and/or failed to intervene and prevent a manufacturing of probable cause by Investigator Hudson in the arrest of Sonia.

Alternatively, even assuming that a jury could reasonably infer that Sergeant Norris somehow possessed knowledge of a constitutional probable cause violation by Investigator Hudson in arresting Sonia, these circumstances are far from one of obvious constitutional clarity, and controlling case law does not establish satisfaction of the fair warning requirement. In reaching its fair warning requirement conclusion, the court relies in part upon the Eleventh Circuit's decision in *Jones v. Cannon*, 174 F.3d 1271 (11th Cir. 1999):

> While officers have been subject to liability for failing to intervene when another officer uses excessive force, *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441-42 (11th Cir. 1985), there is no previous decision from the Supreme Court or this Circuit holding that an officer has a duty to intervene and is therefore liable under the circumstances presented here. There is no controlling authority clearly establishing that once a police officer knows another officer has fabricated a confession in a police report for a warrantless arrest, that police officer has a constitutional duty to intervene to stop the other officer's conduct. As discussed, a police officer is entitled to qualified immunity when performing discretionary functions unless the officer has violated a clearly established right of which a reasonable police officer would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). At a minimum, Jones has not shown that Bishop's failing to intervene to stop Powers's conduct violates any clearly established right of which a reasonable police officer would have known.

*Cannon*, 174 F.3d at 1286 (emphasis added). Therefore, in *Cannon*, even though the evidence showed unconstitutional conduct by a fellow officer (Powers) in fabricating a confession, clearly established law did not create a duty for another officer to intervene.

Here, there simply is no evidence that Sergeant Norris <u>knew</u> that Investigator Hudson lied about Sonia's yelling. Although other witnesses testified that Sonia did <u>not</u> yell, that testimony does not establish that Sergeant Norris knew that Sonia did not yell. Additionally, even assuming the record did support that inference, no clearly established law would have required Sergeant Norris to intervene because of Investigator Hudson's wrongful conduct of lying. Indeed, by extension of *Cannon*,

49

one could argue that the law, to the extent it was developed at the time of the incident, at least implicitly indicated that Sergeant Norris had no duty to intervene under such circumstances.

In their opposition brief, Plaintiffs argue that "[i]t has long been established that an officer who has an opportunity to intervene to protect a citizen from another officer's unconstitutional act is liable as if he committed the act." (Doc. 43 at 22 (citing *Hadley v. Gutierrez*, 526 F.3d 1324, 1330-31 (11th Cir. 2008)). However, *Hadley* and the cases cited therein are excessive force cases.

Plaintiffs then state that "[t]his principle applies in both excessive force and false arrest cases." (Doc. 43 at 22 (citing *Lepone-Dempsey v. Carroll County Com'rs*, 159 Fed. Appx. 916, 920 (11th Cir. 2005)). In *Dempsey*, the Eleventh Circuit stated in an unpublished per curiam decision:

> Finally, Wagner argues that there was no clearly established duty at the time of Plaintiff's arrest for a law enforcement officer to intervene in order to stop an unlawful arrest; only a duty to intervene to stop the use of excessive force. *See Priester*, 208 F.3d at 927. <u>Our precedent suggests, as Wagner points out, that the duty to intervene does not necessarily extend to every conceivable situation involving a constitutional violation</u>. *See, e.g., Jones v. Cannon*, 174 F.3d 1271, 1286 (11th Cir.1999) ("There is no controlling authority clearly establishing that once a police officer knows another officer has fabricated a confession in a police report for a warrantless arrest, that police officer has a constitutional duty to intervene to stop the other officer's conduct."). However, given our holding in *Jackson*-that a claim of excessive force predicated on the unlawfulness of an arrest is

subsumed into an unlawful arrest claim–<u>we do not believe the district court erred in concluding that a duty to intervene in an unlawful arrest was clearly established</u>.

159 Fed. Appx. at 920 (emphasis added).

*Hadley* and *Dempsey* are the only two cases that Sonia relies upon to show that Defendants Norris and Anderson violated clearly established law with respect to <u>Investigator Hudson's</u> false arrest of Sonia.  Because *Hadley* is simply inapplicable and because *Dempsey* does not engage in an extensive analysis of the fair warning requirement, post-dates the incident at issue here, and is unpublished and therefore is at most merely persuasive authority, this court declines to conclude that "a duty to intervene in an unlawful arrest was [indeed] clearly established" at the time of Defendants Norris's and Anderson's actions/inactions with respect to Sonia's (presumably) false arrest.

Additionally, regarding Investigator Anderson in particular, the record (including the omission of any federal claim for false arrest against him in the complaint as referenced above) reflects a complete lack of any involvement by him <u>as to the entire arrest process relating to Sonia</u>.  *See Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam) (recognizing that causation may be shown by personal participation in constitutional violation); *Skop*, 485 F.3d at 1145 ("As the district court observed, Skop failed to present evidence to defeat Padgett's summary

judgment motion- <u>there was virtually nothing in the record to support her claim that</u> <u>Padgett conspired with Brown in an effort to cover up the actual circumstances of her</u> <u>arrest</u>.") (emphasis added).  Alternatively, with respect to Investigator Anderson's alleged role, this is not an obvious constitutional case, and Sonia has not pointed to any controlling authority clearly establishing that a defendant like Investigator Anderson could be liable for false arrest under the circumstances of such remote to non-existent involvement in Sonia's arrest. Accordingly, Defendant Anderson is alternatively entitled to summary judgment due to lack of any constitutional causation, participation, and on fair warning qualified immunity grounds.

### B.   State Agent Immunity

State agent immunity derives from the Alabama Constitution.  As *Milton v. Espey*, 356 So. 2d 1201 (Ala. 1978) explains, "Section 14 of the Alabama Constitution [is the provision] which declares sovereign immunity."  *Id.* at 1201-02. "State-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Ex parte Hayles*, 852 So.2d 117, 122 (Ala. 2002).

Regarding state officials, the *Milton* court further makes clear "Section 14 does not necessarily immunize State officers or agents from individual civil liability." *Id.* at 1203.  As the *Milton* court more specifically explained:

"While the State itself may not be made a party to such action, it does not necessarily follow that its officers, Ray Bass, Claude Kelley and Governor Wallace, in their respective capacities, are also immune. The essence of plaintiffs' complaint is that these officers of the State acted fraudulently, in bad faith, beyond their authority, or acted under a mistaken interpretation of the law. Such allegations bring this case within those not protected by Section 14 of the Constitution. *Wallace v. Board of Education of Montgomery Co.*, 280 Ala. 635, 197 So.2d 428 (1967); *Engelhardt v. Jenkins*, 273 Ala. 352, 141 So.2d 193 (1962); *Finnell v. Pitts*, 222 Ala. 290, 132 So. 2 (1930)." ([e]mphasis added.)

*Milton*, 356 So. 2d at 1203.

More recently, the Alabama Supreme Court restated state agent immunity as follows:

A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's

(1) formulating plans, policies, or designs; or

(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:

(a) making administrative adjudications;

(b) allocating resources;

(c) negotiating contracts;

(d) hiring, firing, transferring, assigning, or supervising personnel;  or

(3) discharging duties imposed on a department or agency

by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or

(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity

(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).

The extension of state agent immunity under the *Cranman* rule to municipal

police officers is explained in *Ex parte City of Tuskegee*, 932 So. 2d 895 (Ala. 2005):

Under Alabama law, "[e]very peace officer . . . shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of

his or her law enforcement duties." Ala. Code 1975, § 6-5-338(a). Before the adoption of the test enumerated in *Cranman*, this Court determined whether a peace officer was entitled to immunity under § 6-5-338(a) by examining whether the officer was engaged in a "discretionary function." *Couch v. City of Sheffield*, 708 So.2d 144, 153 (Ala. 1998); *Ex parte City of Montgomery*, 758 So.2d 565, 569-70 (Ala. 1999); *Williams v. Crook*, 741 So. 2d 1074, 1076 (Ala. 1999); and *Montgomery v. City of Montgomery*, 732 So. 2d 305, 311 (Ala. Civ. App. 1999).  Discretionary acts are defined as "'those acts to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances.' *Wright v. Wynn*, 682 So. 2d 1, 2 (Ala. 1996)." *Ex parte City of Montgomery*, 758 So. 2d at 569. However, discretionary-function immunity under § 6-5-338(a) did not apply when "the officer's conduct was so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith."  *Ex parte City of Gadsden*, 781 So. 2d 936, 938 (Ala.  2000).

The restatement of State-agent immunity as set out in *Cranman*, 792 So. 2d at 405, now governs the determination of whether a peace officer is entitled to immunity under § 6-5-338(a). *Swan v. City of Hueytown*, 920 So. 2d 1075, 1078 (Ala. 2005); *Hollis v. City of Brighton*, 885 So. 2d 135, 143 (Ala. 2004) ("Whether a qualified peace officer is due § 6-5-338(a) immunity is now judged by the restatement of State-agent immunity articulated by *Ex parte Cranman* . . . ."); and *Howard v. City of Atmore*, 887 So. 2d 201, 203 (Ala. 2003) ("Thus, we will address the applicability of peace-officer immunity under the principles set forth in *Cranman*."). "Since *Cranman*, we analyze [§ 6-5-338(a)] immunity issues in terms of 'State-agent' immunity, rather than 'under the dichotomy of ministerial versus discretionary functions.'" *Howard*, 887 So. 2d at 203 (quoting *Ex parte Hudson*, 866 So. 2d 1115, 1117 (Ala. 2003)).

*Tuskegee*, 932 So. 2d at 903-04.  Accordingly, it is appropriate to analyze Defendants

Norris's and Anderson's immunity defense as to Plaintiffs' state law claims under the

*Cranman* restatement of state agent immunity.

After *Cranman*, the Supreme Court of Alabama identified the following legal

framework for addressing state agent immunity issues:

> This Court has established a "burden-shifting" process when a
> party raises the defense of State-agent immunity.   *Giambrone v.
> Douglas*, 874 So.2d 1046, 1052 (Ala. 2003). In order to claim
> State-agent immunity, a State agent bears the burden of demonstrating
> that the plaintiff's claims arise from a function that would entitle the
> State agent to immunity.  *Giambrone*, 874 So.2d at 1052; *Ex parte
> Wood*, 852 So. 2d 705, 709 (Ala. 2002).  If the State agent makes such
> a showing, the burden then shifts to the plaintiff to show that the State
> agent acted willfully, maliciously, fraudulently, in bad faith, or beyond
> his or her authority.  *Giambrone*, 874 So. 2d at 1052; *Wood*, 852 So. 2d
> at 709; *Ex parte Davis*, 721 So. 2d 685, 689 (Ala. 1998). "A State agent
> acts beyond authority and is therefore not immune when he or she
> 'fail[s] to discharge duties pursuant to detailed rules or regulations, such
> as those stated on a checklist.'"   *Giambrone*, 874 So. 2d at 1052
> (quoting *Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000)).

*Ex parte Estate of Reynolds*,  946 So.2d 450, 452 (Ala. 2006).

Here, Plaintiffs do not contest that Defendants Norris and Anderson have met

their burden on the state agent immunity defense by demonstrating that Plaintiffs'

claims arise out of their functions as law enforcement officers.  (Doc. 43 at 29

("Making an arrest is a discretionary function.")).  As a result, the burden shifts to

Plaintiffs to establish why immunity should not apply in this instance.

Insufficient evidence exists in the record to show that Defendants Norris and

Anderson acted "maliciously, fraudulently, in bad faith, or beyond [their] authority[.]"

To the extent that Plaintiffs maintain otherwise in their opposition, arguments from counsel in briefs are not evidence, *see Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980)[23] and, under *Reynolds*, Plaintiffs bear the burden of proof in demonstrating malice or bad faith.

Alternatively, for the same reasons that this court has determined qualified immunity protects Defendants Norris and Anderson because they have not violated any clearly established law, so should state agent immunity bar Plaintiffs' claims. *See, e.g., Sheth v. Webster*, 145 F.3d 1231, 1237 (11th Cir. 1998) ("In both of the latter cases, the court referred to 'qualified or discretionary immunity' as if 'qualified' and 'discretionary function' immunity are one and the same ('Thus as a general rule, city officials are *immune from suit* unless they violate clearly established law'). *Ex Parte City of B'ham* at 1021 and *Marnon* at 761.").

In particular, as this court has found that at least arguable probable cause for arrest existed as to Brown and no unreasonable force was used on her, then state agent immunity should equally apply to Defendants Norris and Anderson. (*See* Doc. 43 at 29-30 (Plaintiffs' arguing that "[i]f an officer lacks arguable probable cause for an arrest . . . [then] he is not entitled to discretionary function immunity) (emphasis

---

[23]   In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

added) (citation omitted); *id.* at 30 (Plaintiffs' arguing that "if an officer <u>uses</u> <u>excessive force</u> he acts wilfully, maliciously, or in bad faith and is not entitled to discretionary function immunity") (emphasis added) (citation omitted)).

Concerning Defendant Norris's participation in the arrest of Sonia, because the record is devoid of evidence that he was aware of any lack of probable cause and/or that Investigator Hudson manufactured probable cause, there is no evidence of wilfulness, maliciousness, or bad faith on Norris's part.  Also, Sonia has not even shown that a duty to intervene with another officer's decision to make an arrest is recognized under Alabama law.

Similarly, as it pertains to Sonia's claim of false arrest against Defendant Anderson, the record fails to establish that he played any role or  had any knowledge regarding the circumstances of Sonia's arrest.  Accordingly, Defendants Norris and Anderson are both entitled to summary judgment on Sonia's state law false arrest claim.

## C.    COH Liability

Plaintiffs concede that summary judgment is due to be granted in favor of the COH with respect to any federal claims asserted against the COH pursuant to § 1983. (Doc. 43 at 30 ("[T]he Court should deny defendants' motion for summary judgment <u>except as to plaintiffs' § 1983 claim against the City</u>.") (emphasis added)).

As for Plaintiffs' state law claims, because the individual defendants are entitled to state agent immunity, so is the COH.  *See City of Bayou La Batre v. Robinson*, 785 So.2d 1128, 1131 (Ala. 2000) ("[W]here a municipal employee enjoys immunity, the municipality likewise is immune as to claims based on the employee's conduct.") (citation omitted).  Plaintiffs' argument in opposition is not over this legal principle (*see* Doc. 43 at 29 (citing *Robinson*)), but rather is premised upon a lack of state agency immunity for false arrest and excessive force (Doc. 43 at 29-30); however this court has found that Plaintiffs' claims for false arrest and excessive force fail for the reasons explained above.    Therefore, the COH is entitled to summary judgment on both Plaintiffs' § 1983 and state law claims.

### D.    Spoliation

Plaintiffs also accuse Sergeant Norris of spoliation of audio and video evidence of the incident contained on Plaintiffs' cell phones.  As a sanction, Plaintiffs ask the court to "assume th[is] evidence would corroborate [their] claims."  (Doc. 43 at 29).  However, Plaintiffs further note that "such corroboration is not required on summary judgment."  (*Id.*).  The court agrees that any corroboration is unnecessary.

"[F]ederal law governs the imposition of spoliation sanctions [ ] . . . because spoliation sanctions constitute an evidentiary matter." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) (citations omitted).  Within the Eleventh

Circuit, "an adverse inference is drawn from a party's failure to preserve evidence <u>only when the absence of that evidence is predicated on bad faith</u>." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (citation and footnote omitted) (emphasis added). "Thus, under the 'adverse inference rule,' we will not infer that the missing [material] contained evidence unfavorable to appellees unless the circumstances surrounding [its] absence indicate bad faith, e.g., that appellees tampered with the evidence." *Id.*

Assuming without deciding that the record supports bad faith on the part of Sergeant Norris in his handling of certain evidence, the impact of the spoliation corroboration rule would not affect the outcome on summary judgment. Put differently, the application of the corroboration rule is immaterial to the court's immunity analysis.

This is because, in granting summary judgment, the court has already accepted Plaintiffs' version of the events and has resolved any disputed material facts in their favor. Therefore, even with further corroboration of their charges, qualified immunity still defeats Plaintiffs' federal claims against Defendants Norris and Anderson, state agent immunity still defeats Plaintiffs' state claims against Defendants Norris and Anderson and, in the absence of any liability on the part of the individual defendants, the COH is still entitled to summary judgment.

## V.     CONCLUSION

For the reasons explained above, the Motions for Summary Judgment filed by

Defendants Anderson, Norris, and the COH are all due to be granted.  A separate

order will be entered.

**DONE** and **ORDERED** this the 14th day of May, 2009.

**VIRGINIA EMERSON HOPKINS**
United States District Judge